Johnson, Chief Judge,
delivered the opinion of the court:
This is an appeal from a decision of the Patent Office Board of Appeals, rejecting claims 3 through 12,14 through 18, 21 and 22, all the claims remaining in appellants’ application No. 111,308, filed August 19, 1949, for “Machine for Producing Dispersions of Liquids in Air or Other Gases for the Production of Fogs,” as unpatentable over the prior art.
The alleged invention, as may be seen from its title, relates to fog producing apparatus, the essential element of said apparatus being a “pulse jet engine.” As will be hereinafter seen, it is not necessary to set forth the claims on appeal nor to further describe the alleged invention, for in the view we take of the case, only a question of law is before us.
The primary reference relied upon by the examiner and by the board is a microfilm copy of the typewritten specification of a German patent application,[1] said microfilm having been applied against appellants’ claims by virtue of the provisions of 35 U. S. C. 102 (b), as a printed publication allegedly published on June 11, 1948.
The history of this microfilm is set forth in appellants’ brief as follows:
A patent application was filed by a German national in tbe former Government Patent Office in Berlin, Germany on February 25, 1943. At tbe end of World War II tbis Government Patent Office, called Reicbspatentamt, became defunct. Some time after tbe close of tbe war military personnel of tbe United States Government obtained access to tbe unpublished patent applications on file in tbe Reicbspatentamt, and recorded them on microfilm, along with a large amount of other technical material.
These microfilms were turned over to tbe Office of Technical Services of tbe United States Department of Commerce. Eventually they were placed in the Library of Congress and tbe Office of Technical Services published tbe Bibliography of Scientific and Industrial reports concerning all of tbe data captured at tbe end of tbe war. Tbe reference here was one of a substantial number of unpublished German patent applications photographed on Reel PB L 83291. Tbis reel was listed in the Bibliography [sic] along with other reels on which *896 were photographed various other unpublished German applications under the following designation: * * *
‘PBL 83291. REICHSPATENTAMT, BERLIN. German patent applications on aircraft. (FIAT Microfilm Reel B 134, Frames 8522-9442) 1937-1945. 942 f. Price: Microfilm — $9.00—Enlargement print — $120.00. IN GERMAN.”
It should he noted that there is no other identification of the material recorded in the reel beyond the single above quoted statement, “German patent applications on aircraft.” The cited frames of the microfilm have no relation to aircraft.
It is stated in the Bibliography that copies could be obtained by ordering them from the Office of Technical Services, giving appropriate PB number identification. * * *
The board, conceding that the faulty indexing of the O. T. S. bibliography would be apt to mislead the public as to the contents of the reel of microfilm in question, and not denying that there was no evidence of record to indicate that any copies of the Karcher document were made from the microfilm on file in the Library of Congress prior to appellants’ filing date, nevertheless held, on the authority of Ex parte Brendlein, 105 USPQ 453 (Bd. Appls. 1955), that the notice of availability to the public in the O. T. S. bibliography of the microfilm in question constitutes said microfilm a “printed publication” within the meaning of 35 U. S. C. 102 (b),[2] as of the publishing date of said bibliography, June 11, 1948 (a date more than one year prior to appellants’ filing date).
Appellants urge that, due to the practical impossibility of locating the microfilm on file in the Library of Congress, even after the O. T. S. bibliography was published (as a result of the faulty indexing), the microfilm was not published within the contemplation of section 102 (b), sufra. They further argue that the microfilm was not “printed.”
Counsel for the Commissioner admitted during oral argument that if the microfilm is held not to be a valid reference (viz, a printed publication) all the claims on appeal are allowable.
The issue confronting us, therefore, is whether a microfilm, which allegedly was made available to the public only by virtue of the publication of a bibliography, there being no evidence of record that any copies of said microfilm have been made or seen by any member of the public, is a “printed publication” within the meaning of that term as used in 35 U. S. C. 102 (b).
The importance of this question is at once obvious. At first blush we had thought that this decision might be influenced by a prior decision of this court: Reginald A. Fessenden v. Richard H. Wilson et al., 18 C. C. P. A. (Patents) 1171, 48 F. 2d 422, 9 U. S. Pat. Q. 274, *897 cert. denied 284 U. S. 640 (1931). This decision was urged by appellant as analogous to the instant case. The case has been cited on a number of occasions by other courts as well as by the Patent Office, as standing for the proposition that matter appearing in a patent application as originally filed, but cancelled before the application issued as a patent, does not constitute a printed publication. Tampax, Inc. v. Personal Products Corp., 38 F. Supp. 663 (D. C. E. D. N. Y. 1941); Gulliksen v. Halberg (dissenting opinion), 75 USPQ 252, 256 (Bd. Appls. 1937). We have examined the Fessenden case carefully but,, granting the language used therein is somewhat misleading, we do not feel that the case stands for the proposition attributed to it. There, in answer to the appellant’s argument that the cancelled description in appellant’s application, filed June 23, 1915 and issuing as a patent on May 14,1918, was sufficient to bar appellees from a patent on the ground that they were not the first inventors, the court said:
* * * The statute authorizes the granting of a patent under certain conditions if the invention is:
not known or used by others in this country, before his invention or discovery thereof, and not patented or described in any printed publication in this or any foreign country, * * *
For obvious reasons, the filing of an application, the description of which is canceled before it results in a patent or comes to the public notice, is not such a published description of the invention as is within the inhibition of the statute. Milburn Co. v. Davis-Bournonville Co., supra.[3]
It is rather obvious, from the court’s citation of the Milburn case (which says nothing of printed publications) that the appellant had not urged that the patented file containing the cancelled matter constituted a printed publication, nor had the court that in mind. Appellant was merely urging that all matter contained in an application as filed constituted a disclosure sufficient to bar the granting of a patent under the well known rule of the Milburn case, which now has been codified into 35 U. S. C. 102 (e).
We have found no other decisions of this court which bear on the instant question. The issue before us is, therefore, at least as far as this court is concerned, one of first impression.
We have carefully considered most of the countless cases in the reports on the question of what is or is not a printed publication. Irreconcilable conflicts exist as between the holdings of a number of them and few have set forth sufficient reasoning to be of any assistance to us. In reaching our conclusion we of necessity must disagree with at least several of these cases.
Be this as it may, we are of the opinion that the microfilm in the instant case is not a “printed publication” within the contemplation *898 of 35 17. S. C. 102 (b) and that, therefore, the decision of the board must be reversed. More specificially, we are of the opinion that the microfilm is not “printed.” [4]
In United States v. Dubilier Condenser Corp., 289 U. S. 178, 186 (1933), the Supreme Court, speaking through Mr. Justice Eoberts, stated:
Though often so characterized, a patent is not, accurately speaking, a monopoly, for it is not created by the executive authority at the expense and to the prejudice of all the community except the grantee of the patent. Seymour v. Osborne, 11 Wall. 516, 533. The term monopoly connotes the giving of an exclusive privilege for buying, selling, working or using a thing which the public freely enjoyed prior to the grant. Thus a monopoly takes something from the people. An inventor deprives the public of nothing which it enjoyed before his discovery, but gives something of value to the community by adding to the sum of human Jmowledge. United States v. Bell Telephone Co., 167 U. S. 224, 239; Paper Bag Patent Case, 210 U. S. 405, 424; Brooks v. Jenkins, 3 McLean 432, 437; Parker v. Haworth, 4 McLean 370, 372; Allen v. Hunter, 6 McLean 303, 305-306; Attorney General v. Rumford Chemical Wor Jos, 2 Bann. & Ard. 298, 302. He may keep his invention secret and reap its fruits indefinitely. In consideration of its disclosure and the consequent benefit to tJie community, the patent is granted. * * * [Emphasis added.]
Emphasis has been placed on the portions of the foregoing passage relating to the benefit conferred upon the public by the grant of a patent. It will be observed that unless the public so derives benefit, unless the patentee, by his disclosure, adds to the sum of human knowledge, the grant of a patent would, in fact, be a monopoly within the above definition, and the policy of the patent laws would be frustrated.
Thus, in Eobinson on Patents, Vol 1, p. 305 (1890), it is stated that:
An inventor does not become entitled to a patent merely by exercising his creative faculties in the production of an art or instrument. The consideration for the grant of his exclusive privilege is the benefit which he confers upon the public by placing in their hands a means through the use of which their wants may be supplied. If the same means has been already made accessible to them by the inventive genius of a prior inventor, or if though they receive it first from him it is incapable of useful application, no benefit results to them from his inventive act and there is no consideration for his patent. When this want of consideration becomes apparent before a patent has been granted it will be refused; when afterward, the patent is defeated. In order, therefore, that an invention may be patented or protected by a patent, it must be new, that is, bestowed for the first time upon the public by the patentee * * *. [Emphasis added, except for new.]
On p. 423 Eobinson states:
The identity of two inventions having been established, the legal novelty of either depends upon the state of public Jcnowledge, at the date of its invention, *899 concerning tlie existence and the nature of the other. If one existed in a manner accessible to the public when the other was invented, the latter is not new to the public, whatever it may be to the inventor; and, on the other hand, though the earlier were a complete art or instrument at the date of the invention of the later, yet if it were concealed and inaccessible, so that the public had derived no benefit from its invention, the later, if first introduced to public use, becomes in reference to them a new invention, entitling the inventor from whom they receive it to a patent. [Emphasis added.]
And in an English case, Patterson v. Gas Light & Coke Co., L. R. 3 App. 239, 244 (1877), it was stated that:
The consideration for a patent is the communication to the public of a process that is new. In Hindmarch on Patents (1st ed. 1846, p. 83) it is laid down that “if the public once becomes possessed of an invention by any means whatever, no subsequent patent for it can be granted, either to the true or first inventor himself or any other person; for the public cannot be deprived of the right to use the invention, and a patentee of the invention could not give any consideration to the public for the grant, the public already possessing everything that he could give.” * * * If the invention and the mode in which it can be used has been made known to the public by a description in a work that has been publicly circulated, * * * or in a specification duly enrolled, * * * it avoids the patent, though it is not shown that it ever was actually put in use.
See also Stead v. Williams, 2 Webs. Pat. Cas. 137, 142.
We have quoted the foregoing passages liberally, for we feel that in these passages lies the foundation of the “printed publication” bar of our present patent act. While it is true that, in various particulars, the English case aforequoted is not applicable to our patent laws, the broad language used is consistent with what we feel is good reasoning and good law today. The essence of all we have quoted is that, in consideration for the patent grant, something must be given to the public which it did not have before (albeit that the enjoyment of this “something” may be postponed for 17 years). If the public is already possessed of that “something,” or if it is accessible to the public, there is a failure of consideration and no patent may be granted.[5] Note the statement in Cottier v. Stimson, 20 Fed. 906, 910 (C. C. D. Ore. 1884), wherein the “printed publication” bar of the Patent Act of 1870 was considered:
* * ? The statute goes upon the theory that the work has been made accessible to the public, and that the invention has thereby been given to the public, and is no longer patentable by any one. * * * [Emphasis added.]
If our analysis of the basis of the “printed publication” bar is correct, numerous questions arise. If it is prior “accessibility” to the public of the subject matter of the invention that is the essence of the bar, why have the courts and the Patent Office consistently held that *900 a foreign typewritten patent application file which has been opened to public inspection in a foreign patent office is not a bar under the “printed publication” provisions of the current and predecessor patent acts? De Ferranti v. Westinghouse, Jr., 1890 C. D. 114 (Commr. Pats.); Parkin and Wright v. Jenness, 1893 C. D. 64 (Commr. Pats.); Ex parte Ulmann, 1925 C. D. 27 (Commr. Pats.); Bayer v. Rice, 24 USPQ 38 (C. A. D. C. 1934); Ex parte Haller, 103 USPQ 332 (Bd. Appls. 1953); Carter Prods., Inc. v. Colgate-Palmolive Co., 104 USPQ 314, 320-321 (D. C. D. Md. 1955). Why have the German Gebrauchs-muster, which are typewritten and open for public inspection, not been applied as statutory bars under the same provisions.[6] Permutit Co. v. Wadham, 13 F. 2d 454, rehrg. 15 F. 2d 20 (6th Cir. 1926); Permutit Co. v. Graver Corp., 43 F. 2d 898 (7th Cir. 1930); Ex parte Smith, 82 USPQ 83 (Bd. Appls. 1941).
It would seem that based upon pure logic alone, the foregoing means of accessibility to the public would be equally effective in vitiating the consideration necessary to support the patent grant as would be “printed” publications. The answer to the foregoing questions, however, is not to be obtained by logical analysis, for as will hereinafter be shown, Congress’ failure to cover this type of situation has unquestionably been due to legislative oversight or to some obscure policy not detectible on the face of the opinions considering the question nor in the volumes containing the legislative history of the “printed publication” provision.
It is clear, however, that the reason the foreign patent applications were not applied as bars by the courts is found in the requirement that the publication, to be a bar, must be “printed.” [7]
Congressional concern over the “printed” aspect of the publication necessary to constitute a statutory bar to the grant of a patent may best be considered by a discussion of handwritten publications.
Ho one would dispute the fact that a wholly handwritten publication is not embraced within the phrase “printed publication.” For one reason or other, Congress felt that such a publication would not be sufficient to establish that the invention sought to be patented was already in the public realm (or, as aforestated, was accessible to the public). Clearly, Congress’ reason for excluding handwritten publications did not relate to the permanence of the publication, for it is common knowledge that there are numerous handwritten manuscripts *901 extant which are centuries old. It is equally certain that Congress was not concerned with the legibility of the publication, for if the publication were illegible, whether “printed” or handwritten, no one would argue that it would constitute a statutory bar under the here involved provisions of the Patent laws. And to say that Congress was concerned with the appearance of the publication is to ignore realities. The only realistic distinction that we can see as between “handwritten” and “printed” publications relates to the method of producing them.
What was said by Mr. Edinburg, Examiner-in-Chief of the Patent Office, in his dissenting opinion in Gulliksen v. Halberg, 75 USPQ 252, 254-255 (Bd. Appls. 1937), is apposite to this point:
The original patent act of 1790 was repealed in 1793 and a new act substituted. Section 6 of this act provided:
“That the defendant in such action shall be permitted to plead the general issue, and give this act and any special matter — in evidence, tending to prove that — the thing thus secured by patent was not originally discovered by the patentee, but had been in use, or had been described in some public work, anterior to the supposed discovery of the patentee.”
The patent act was revised in 1836. The revised act provided in Section 15 that the defendant could plead any matter tending to prove that the invention
“had been described in some public work anterior to the supposed dis-eovery thereof by the patentee or had been in public use etc.”
In the same act of 1836, Section 7 employed the words “printed publication” and “public use.” It is to be noted that there is uncertainty whether “public work” in section 15 referred to the same thing as ‘‘printed publication” in section 5.[8]
In the act of 1870, the words ‘‘public work” were dropped and the words “printed publication” adopted in place of them. The present Revised Statute also employs only the words “printed publication.” It appears from this that the statute as at present drawn does not contemplate any “public work” as being a bar but some special public work, namely, a printed publication.
* if * * * >S
One decision, Keene v. ’Wheatley, 14 Red. Oases 1764, rendered during this period discussed this part of the statute and throws some light on its meaning. In this decision it was stated:
“Under the laws concerning patents for inventions, a previous description of the alleged invention in a ‘public work,’ which means a printed book defeats a patent. But such a description in an unprmted book has in itself no such effect.”
Here the Court draws a distinction between a “printed book” and an “unprinted book.” In the same decision there is a discussion of a distinction drawn between “writing” and “printing.” The Court refers to “printing” as a process of multiplying the copies by sheets and to “writing” as making copies letter by letter. The Court stated,
*902 “Thus the difference is that between multiplication and addition human means of increasing the number of copies by writing are extremely limited. By printing, they may, on the contrary, in the words of Lord Cranworth be multiplied, indefinitely." [Emphasis in original.]
But we do not think that we should stop at this point in our analysis of what Congress intended by “printed.” A further refinement may be made by viewing the words “printed publication” in the context in which they appear in the Patent Act. It is to he noted that a “printed publication” may be an effective bar to the granting of a patent if it is “in this or a foreign country.” 35 U. S. C. 102 (a) (b). For knowledge or use of the invention to be a statutory bar, however, it must be “in this country.” 35 U. S. C. 102 (a). The patent act of 1836 made the same distinction. Act of July 4, 1836, c. 357, § 15, 5 Stat. 123. Bearing in mind the basic nature of the patent grant, as heretofore discussed, it becomes readily evident that what Congress was concerned with, both in 1836 and 1952, was the probability that the subject matter would be made known to the American public. Knowledge and use in the United States would probably (or so Congress must have reasoned) come to the attention of the American people whereas the same probability would not be present with respect to such knowledge and use abroad. By the same token, in the case of “printed” publications, Congress no doubt reasoned that one would not go to the trouble of printing a given description of a thing unless it was desired to print a number of copies of it. ISTote a further statement in the dissenting opinion of the Gulliltsen case, supra, at p. 255:
It has been suggested that the words “printed publication” as used in the patent statute hare a special connotation and should be considered together rather than separately. If so considered, it is believed that “printing" would obviously refer to some mode of producing copies which would ordinarily be used in malcing a large number of copies so as to insure general distribution or publication. * * * [Emphasis added.]
Printing alone, of course, would be insufficient to reasonably assure that the public would have access to the work, for the possibility always exists that the printed matter may be suppressed and might never reach the public. Then too, there are time lapses between the printing and the publishing of a given work, and the public is not to be charged with knowledge of a subject until such time as it is available to it. For this reason, it is required that the description not only be printed but be published as well.
But though the law has in mind the probability of public knowledge of the contents of the publication, the law does not go further and require that the probability must have become an actuality. In other words, once it has been established that the item has been both printed and published, it is not necessary to further show *903 that any given number of people actually saw it or that any specific number of copies have been circulated.[9] The law sets up a conclusive 'presumption to the effect that the public has knowledge of the publication when a single printed copy is proved to have been so published. See Evans v. Eaton, 3 Wheat. 454, 514 (1818); Curtis, Law of Patents, pp. 500-503 (4th ed. 1873).
Using the foregoing as a guide, the answer to the instant question is clear. While microfilming furnishes a means of multiplying copies, there is no probability, from a mere showing that a microfilm copy of a disclosure has been produced, that the disclosure has achieved wide circulation and that, therefore, the public has knowledge of it. The nature of present day microfilm reproduction differs from normal printing methods. Though one would be more likely than not to produce a number of copies of printed material, one producing an item by microfilming would be as apt to make one copy as many. In the case of printing, unless a number of copies were produced, a waste of time, labor and materials would result; present day microfilming methods, on the other hand, are as well designed to produce one microfilm as well as many without waste.
It is no doubt true that the present law is anomalous, as evidenced by our conclusion that the microfilm is not “printed.” A foreign patent file, laid open for public inspection, is not a printed publication, because typewritten, while a printed publication, available to the public only in a Southern Rhodesian library, would be. The former is obviously more likely to reach the eyes of the American public than the latter. It is obvious, however, that unless we are to rewrite 35 U. S. C. 102 (b) for Congress, this must be the result reached. Our job is to interpret the law, not to make it.
For the foregoing reasons, the microfilm copy of the Karcher disclosure is not a “printed publication” within the contemplation of section 102 (b). Our conclusion that the microfilm is not “printed” makes it unnecessary to consider whether it was published.
In view of the concession that the claims must stand allowable if this reference is held to be of no legal effect, the decision of the board is reversed.

 Kareher, German Patent Application No. 138,004, filed February 25, 1943.

 The import of the board’s decision is that the microfilm per se, ty virtue of the O. T. S. notice of availability, is the printed publication relied upon ; the board’s opinion expressly rejects possible reliance on the O. T. S. bibliography as such.

 270 U. S. 390 (1926).

 In the course of this opinion, reference will be made to the “publication” aspect of the question before us, but only because we are of the opinion that the words “printed” and “publication” are so connected with one another that treatment of the one cannot be satisfactorily done without overstepping into the bounds of the other. The opinion, however, is not intended to be at all definitive on the question of what constitutes a “publication.”

 Congress, of course, lias not made the existence of a “printed publication” a bar to the grant of a patent under all circumstances. Congress has given applicants a period of grace of one year after the invention has been described in a printed publication for the applicant to file his application. 35 U. S. C. 102 (b).

 It is to be noted that, inconsistently with these cases, typewritten college theses placed on library shelves have been held to be “printed publications.” Ex parte Hershberger, 96 USPQ 54 (Bd. Appls. 1952) : Gullilcsen v. Halberg, 75 USPQ 252 (Bd. Appls. 1937) ; Hamilton Laboratories v. Massengill, 111 F. 2d 584 (6th Cir. 1940).

 The earlier decisions did not urge this as the reason, De Eerranti, Parldn & Wright, Ulmann and Bayer V. Rice cases, supra, but the later decisions, in which the earlier were cited, made it unmistakably clear that the applications were not “printed” and were, therefore, not printed publications, Haller and Darter Products cases, supra.

 This should he section 7.

 This statement, however, presupposes publication in fact. The so-called "publication” cannot be a private communication or the like. Dow Chemical Co. v. Williams Bros. Well Treating Corp., 81 F. 2d 495 (10th Cir. 1936); see also Jockmus v. Leviton 28 F. 2d 812 (2d Cir. 1928).