**PHILLIPS ELECTRONIC AND PHAR-MACEUTICAL INDUSTRIES CORP., Plaintiff,**

**v.**

**THERMAL AND ELECTRONICS IN-DUSTRIES, INC., Defendant.**

**Civ. No. 1026-63.**

United States District Court,
D. New Jersey.
March 23, 1970.

McCarter & English, by James R. E. Ozias, Newark, N. J., for plaintiff; Connolly, Bove & Lodge, Wilmington, Del., by Januar D. Bove, Jr., and Jacob G. Kellem, Wilmington, Del. (Delaware Bar), of counsel.

Lawrence I. Lerner, Newark, N. J., for defendant; Hopgood & Calimafde, New York City, by John M. Calimafde, and Eugene J. Kalil, New York City (New York Bar), of counsel.

## OPINION

SHAW, U. S. District Judge.

The issues in this matter are validity of plaintiff's patent and alleged infringement by defendant. The action is brought pursuant to the provisions of 35 U.S.C. §§ 271, 281. The Court has jurisdiction by virtue of 28 U.S.C. §§ 1338, 1400(b). A similar suit was brought by plaintiff against Glasseal Products, Inc., Civil No. 999–63. The cases were consolidated for trial but after trial plaintiff and defendant in Civil No. 999–63 reached agreement for disposition of the ltigation leaving the instant case for disposition by the Court.

Plaintiff is the owner of U. S. Patent No. 3,035,372, the patent in suit. The inventor was Karl F. Mayers. Plaintiff is the assignee. Defendant is a New Jersey corporation with a regular and established place of business within this district. Defendant had timely notice of the existence of the patent in suit and also timely notice of alleged infringement. Plaintiff and defendant have stipulated that all claims as to validity and infringement may be determined on Claim 1 of the patent.

The patent is a method or process patent for making glass-to-metal seals. There were three applications: The first was filed on March 17, 1951; the second on December 4, 1953; and the third, after abandoning the two prior applications, on April 5, 1957. The patent was issued on May 22, 1962. The alleged invention was conceived during 1950. In 1955 and 1956 British and Canadian patents were issued to plaintiff covering the same process involved in the instant case. Defendant has been making compression glass-to-metal seals which plaintiff contends infringes its patent.

The patent discloses a method of making a three element compression glass-to-metal seal. These seals are used in connection with electron tubes, relays,

transformers, and other electrical devices. They serve to complete electrical circuits between elements of electrical devices. The seals consist of an assembly with three components, an outer metal member or ring, an inner metal member which is the electrical conductor, and a glass intermediate member between the ring and the conductor. The seals must be vacuum or pressure tight. The three members are unified by the application of heat followed by a cooling procedure. It has been the object of the industry to make seals with the highest possible resistance to thermal and mechanical shock and stress. Plaintiff's patent discloses a process which seeks to create such a seal. The method of Claim 1 of the patent involves the following steps:

A. Forming an assembly in a jig of the following members having mismatched coefficients of thermal expansion:

(1) outer metal (usually ring-shaped)

(2) glass, and

(3) inner metal (wire or pin);

B. Heating the entire assembly to a temperature at which the glass melts and flows radially of its own weight to fill the radial space between the inner and outer metal members;

C. Rapidly cooling the heated assembly from said temperature to a lower temperature which is below the annealing temperature of the glass to solidify and avoid annealing the glass and to set up stress therein so as to increase the compressive forces holding the glass in the outer metal member in the glass; and

D. Removing the seal from the jig without annealing the seal.

The first step in the process is to assemble the component parts of the seal in a jig. The seal as assembled is described as a mismatched seal. The mismatch is the result of a difference in coefficient of thermal expansion (CTE) of the component parts. The outer metal member of the seal must have a CTE substantially higher than the glass. The glass and inner members have approximately the same CTE. The assembly is subjected to heat until the glass melts and flows radially of its own weight. At that point the glass is stress-free. Annealing is the process of removing or minimizing stress in the glass. After the glass has reached the melting point, the entire assembly is rapidly but uniformly cooled. During this process the outer metal member (because of the difference in CTE) shrinks more rapidly than the glass and exerts compressive forces upon the glass. During the process the outer surface of the glass begins to harden and shrink but the inner part does not shrink proportionately because the glass is a poor conductor of heat. Cooling builds up stress in the glass and the more rapidly the glass is cooled, the greater the stress. By rapid and uniform cooling of the assembly, the interaction of the compressive force of the metal ring on the hardening surface of the glass, plus the forces created within the glass by differential of reaction by different rate of cooling of the inner part combines to build stress within the glass. The inner part which cools less rapidly than the outer surface exerts force against the hardening outer surface of the glass and, in turn, the more rapidly shrinking outer metal ring exerts compressive force against the surface of the glass. It is the combination of compressive force upon the outer surface of the glass while cooling and the expansive force of the less rapidly cooling inner part of the glass against the outer surface which creates and retains stresses in the glass which make it highly resistant to mechanical or thermal shock. Rapid cooling of glass creates stresses which can be undesirable because they are likely to rupture the glass either in process or upon subsequent shock. Slow cooling avoids this because it minimizes the relative difference in temperature of the inside of the glass and the outside surface. But it is alleged that the compressive force of a mismatched outer metal ring permits rapid cooling of the entire assembly without danger of rupture of the

glass either in process or after production. Accordingly, it is claimed that this process produces a seal having high resistance to mechanical or thermal shock.

The fact that rapid cooling of glass induces stress is not novel. It had been well recognized that rapid cooling of glass from a liquid or molten state would create stresses which could be undesirable because they are likely to rupture the glass either in process or upon subsequent shock. Accordingly, to avoid this undesirable result, slow cooling and differential cooling had been employed. The result of slow cooling is that the inner part of the glass exerts less force against the hardening outer surface. Differential cooling achieves the same result by cooling the metal and glass at substantially different rates from each other. This avoids the compressive effect of stress in the glass. Plaintiff's method cools uniformly, i. e., the entire assembly is cooled by application of the same rate of temperature. The success of plaintiff's process is the alleged result of uniform rapid cooling of a mismatched compression seal and particularly a differential in shrinkage of the component parts during cooling by reason of the different CTE's of the members of the assembly.

During the process the seal is taken through an annealing range of heat. It is heated to the melting point of the glass and then rapidly cooled down to the strain point. The annealing range is the range between two temperatures. The annealing point is the higher temperature at the upper level of the range and the strain point is the temperature at the lower range. If the glass is cooled rapidly down to the strain point, stresses are created and retained. During the cooling process annealing to relieve stress is avoided because retention of the stresses in the glass to make it shock resistant is desired. The temperatures of the upper and lower range are determined by the viscosity of the glass. When glass is cooled from a liquid form strain or stresses are formed in the glass as the temperature is being reduced while the seal passes down through the annealing range. Above the annealing point the glass is free of stress. Below the strain point in cooling all strain is established and no new strain can be formed.

It was generally believed by those in the glass industry that when fabricating other than flat glass, stresses should be removed or prevented by annealing. Plaintiff's process purposely avoids annealing. As above mentioned, annealing relieves stress and it is the object of plaintiff's process to increase and *retain* the stresses in the glass. The process of avoiding annealing is described in Claim 1, page 6, line 30, of Exhibit P–5:

> * * * heating the entire assembly to a temperature at which the glass melts and flows radially of its own weight to fill the radial space between the inner and outer metal members; rapidly cooling the heated assembly from said temperature to a lower temperature which is below the annealing temperature of the glass to solidify and to avoid annealing the glass and to set up stress therein so as to increase the compressive forces holding said glass in said outer metal member in said glass; and removing said seal from said jig without annealing said seal.

Dr. Guy E. Rindone, a professor of Ceramic Science in the Material Science Department of the Pennsylvania State University, gave the following testimony descriptive of the compressive stresses created by the patent process:

Q. Does the cooling step of the patent have a specific rate of cooling in it?

A. Yes. It has a rate which specifically says you don't want to release any of the stress which you would have as a result of the mismatch of the seal. In addition, you want to induce additional compressive stresses which will further strengthen it, and this to me is one of the unusual features of this particular process.

If you will recall, your Honor, I was explaining annealing before and I

didn't get a chance to finish. When you rapidly cool a piece of glass it begins to shrink. Now the surface wants to be, say—the surface wants to be a hundred centimeters long. The inside at that times wants to be 120 centimeters long. You have a hundred centimeters and 120.

THE COURT: Because the outer surface is hardening?

THE WITNESS: And the inner surface is cooling.

THE COURT: And the inner surface doesn't conduct heat—does not shrink proportionately?

THE WITNESS: Right, but there is one point that has not come out up to this point, and that is the outer surface cannot shrink as much as it wants to once the inner surface begins to solidify, so while it wants to be a hundred centimeters the inner surface which is 120 centimeters makes it 105 or 110 centimeters long, so what does this mean? This surface is in tension during the cooling process and it is only when we get rid of the temperature gradient that that tension reverts into a compression. Now, when you compress a glass by tempering process you have to pass through this region where it is temporarily under tension, which can cause it to break, and this is why you cannot cool a glass which is complicated in shape uniformly enough, rapidly enough to place it in compression without having a good chance of breakage during the cooling process.

In this seal the combination of the mismatched metals on this glass exert a force on this glass during the cooling process which keeps all of the surfaces of the glass under compression during the cooling process, which is contrary to any tempering process that you would have in free glass. Consequently, they don't have to worry about setting up these tensile stresses during the cooling process which could cause it to fail. This compression which is exerted by the ring keeps that glass

under sufficiently high compression on cooling, which becomes increased after the temperature gradient is removed and makes it a seal which is much, much stronger than it would be if you were to anneal this seal which contains the mismatched materials or if you were to differentially cool the seal which would give the outer ring less of a compression force inside. So this combination of maintaining this glass under compression during the cooling step, which is indicated here, is extremely significant, and this is why when I read the patent I was convinced in my mind—and I told Mr. Kellem—I said, "This is something no one would have thought that you could maintain this material under this compression while you were cooling and subject it to this rapid cooling technique which would allow it to have this added strength of the mismatch plus the tempered strength that you get from the glass."

Karl F. Mayers, the inventor, testified as to his conception of the annealing process, the manner in which annealing is avoided while the glass is being rapidly cooled, and the end result of stresses in the glass to make it shock resistant:

Q. And you recommend that an annealing operation is not desired. In your opinion is this an explicit teaching that one who desires to enjoy the benefits of your invention should not anneal, or is this a mere recommendation that he may or may not but it is not desired?

A. We do not want it to be annealed.

Q. So you interpret this as implicit teaching that your invention does not anneal, is this correct?

A. That is correct.

Q. Now let me direct your attention to Column 5.

THE COURT: Well, may I interrupt you for a moment?

MR. CALIMAFDE: Yes.

THE COURT: I am not entirely clear on this annealing process. I have in my notes, and I may not have this the way it was said, an annealing operation is one

that removes strain or stress in glass. It is accomplished by subjecting glass to heat treatment.

THE WITNESS: Yes.

THE COURT: And the removal of stresses of glass is accomplished by the application of the heat. Am I correct in that?

THE WITNESS: Control of heat, yes.

THE COURT: And in your process, as I understand, annealing is not recommended?

THE WITNESS: Not as I understand.

THE COURT: I am sorry. That isn't language that I desire. In your process is the glass heated?

THE WITNESS: Oh yes.

THE COURT: What point in this process are we talking about when you were saying annealing is not desired?

THE WITNESS: Well your Honor, I'm not a glass technician, but I can give you some idea and perhaps you can get that in another way, but there are two important points in the glass, one known as the anneal point which is higher and one known as the strain point which is lower, and between those two temperatures, the two temperatures known as the anneal point and the strain point, is a very critical condition as far as glass. That is where the glass becomes or the glass is in such a temperature that strains are relieved within a given time. I am not, as I say, a glass technician, so I can't give you the mechanics. The glass is given sufficient time to allow the strains to work themselves out.

THE COURT: What I am concerned about is where in this particular inventive process is this absence of annealing desired?

THE WITNESS: Between the anneal point and the strain point of the glass, which are two points given in practically any glass material or glass catalog.

MR. CALIMAFDE: Perhaps I can bring this out by examination.

THE COURT: Go ahead.

Q. Mr. Mayers, after your seal is subject to heat so that the glass is in its melted condition—

A. Yes.

Q. —do you then subject the assembly to a cooling process, do you not?

A. Yes.

Q. And now as it cools it passes through what we call an annealing range, does it not?

A. Correct.

Q. Now if you cool so the glass stays within that annealing range for a period of time so as to relieve the stresses in the glass then you have annealed that glass, have you not?

A. A good portion of it, yes, about 90 per cent.

Q. Now alternatively if you cool that same glass but you cool it through the annealing range more quickly than if you had cooled it so it remained in the annealing range to relieve stresses, now you go through the annealing range so it does not relieve all the stresses.

A. Yes.

Q. Then you have not annealed your glass.

A. You have not annealed.

Q. And your glass is a stressed one.

A. Your glass is a stressed one, correct.

Q. So that in answer to the Court's question, a definition of annealing is a method for bringing the glass down from its molten temperature to its cool temperature, and it is annealed if it stays in the annealing range a given period of time.

A. That is correct.

Q. And we can detect this in the final product because annealed glass would be relatively stress free, whereas an unannealed glass would be a stressed glass.

A. That is right.

Q. Now let's clear up perhaps one ambiguity. If one were to cool the glass rapidly from the molten temperature to the cool temperature so that he went through the annealing range and the an-

nealing range is nothing more than two temperatures—isn't that right?

A. Two temperatures.

Q. Whatever name we give these two temperatures, the annealing range is nothing more than two temperatures.

A. A particular two temperatures.

Q. And your melting temperature is above these two temperatures.

A. That is correct.

Q. So that as you are cooling your glass it then goes into this range which we call the annealing range.

A. Yes.

Q. Let's assume the condition where the glass and the assembly is brought through this range more rapidly than would be required to anneal it, so that the glass is stressed.

A. Yes.

Q. And now one heated this assembly again and brought the glass up to the annealing range.

A. Yes.

Q. And left it in that annealing range for a period of time, would that person be annealing his seal?

A. Yes.

Q. And in so doing he would avoid your patent.

A. He could.

Q. Would he?

A. I don't know. I would have to know more about the process.

\*    \*    \*    \*    \*    \*

THE COURT: Well I am interested in what is done with respect to your patent as distinguished from any other process.

THE WITNESS: Well, in trying to answer your question, we are not concerned with the molten glass. We are not concerned with the temperature until it reaches a specified temperature known as the anneal point. From thereon, above the anneal point, any strain that is in the glass—no strain is going to stay in it. It is soft. It can't be in strain. It can't be in compression. It is in a soft

condition. It reaches a point known as the anneal point where now stresses can remain in the glass or can slowly dissipate themselves, and between that point and when the glass becomes hard enough, which is below the strain point or at the strain point or below, no outside forces can affect the glass.

I am very poor in explaining this particular part, but this is unlike most materials. Glass is unlike most materials in that it does not cool—when it cools it has a particular—how shall I state it. There is a particular critical thing that takes place between two different temperatures. If you are cooling a cake or cooling a piece of metal the same things don't occur.

Now, when you ask me the mechanics I cannot explain them, but there is a— you take it down from a molten condition until it reaches a certain degree of hardness. All this annealing is based—or these temperatures are based on the hardness of the glass or the condition of the glass, the viscosity of the glass is the term I should use. We have some technical experts here that I think should explain the situation better than I can, and not confuse you, sir.

THE COURT: All right.

Q. Mr. Mayers, is it correct to state that the process described in your patent thus far is one in which you assemble the outer metal ring, the glass and the inner pin in a jig. You place the jig with these components in an oven. You raise the temperature of the oven to the melting point of glass. You then subject the assembly to cooling, and you cool it at a fast enough rate so that the glass does not become annealed. Is that a correct statement of the processes of your invention?

A. So that the glass is not annealed.

Q. Yes. That is what I said.

A. I would ask you to go through that again. I didn't follow you at one point.

Q. Let's take it from the point where the glass is subjected to heat and melted.

A. Yes.

Q. Now you then cool this assembly of three parts.

A. Yes.

Q. The outer metal ring, the glass and the inner pin.

A. Yes.

Q. And you cool it from the melting temperature to the cooling temperature so it passes through this annealing range fast enough so that the glass does not become annealed.

A. Right.

Q. Is that a correct description of your process?

A. That is a description of that part of the process, yes.

Q. Now as I understand further, the expression "rapid cooling" is not really necessary as long as I say there is no annealing, is that correct?

A. It would not be correct to leave it out entirely, but it appears in several places.

Q. Let me understand your testimony, Mr. Mayers. Is it necessary that you say rapid cooling and no annealing?

A. Well you can't very well pass through the no annealing without rapidly cooling.

Q. So if I say you cool your glass but you don't anneal it am I necessarily saying that you rapidly cool the glass?

A. Yes.

Q. And now a question in regard to the condition of this glass after it had been cooled. We know that the seal had been rapidly cooled, alternatively it has not been annealed, because the glass is in the stressed condition, is that correct?

A. It is not annealed because the glass was not subjected to a particular heat treatment.

Q. It is not annealed because it has not been heated, but now we have the finished product, and in the finished product we know it has not been annealed because the glass is stressed.

A. That can be true, yes.

Q. Well if it were annealed the glass would no longer be in a stressed condition, would it?

A. Yes.

It seems clear from the testimony that annealing relieves stress. Annealing is accomplished by heat. Accordingly, when the glass is heated to a molten state it is relatively free of stress but when it is cooled and begins to harden, stress in the glass is created. Rapid cooling causes more stress. Slow cooling down through the annealing range minimizes stress. Hence, as disclosed by the testimony, the term "annealing" is used to describe two aspects of the process. When the glass is heated to a molten state it is annealed. When a relatively high degree of temperature is maintained for slow cooling to a hardened state, stress in the glass is minimized and the glass is annealed while passing from the molten state to the hard state.

These effects of cooling were generally well known before the Mayers patent but creating the stresses to make the glass hard without rupturing it in the process and retaining the stress in the glass after the process is the factor of alleged novelty in the Mayers patent claimed to be the result of uniform rapid cooling of a mismatched seal and particularly the interaction of compressive force of the outer metal ring upon the surface of the glass and the expansive compressive force of the soft glass in the inner part against the hardening outer surface of the glass. A combination of the compressive force within the glass as it cools and of the metal ring shrinking as it cools against the outer surface of the glass seems to create and retain the desired stresses in the glass to make it shock resistant.

## VALIDITY

The initial issue that must be considered is the validity of the patent in issue. In order for a patent to be upheld it must meet the requirement of novelty. The applicable statute, 35 U.S.C. § 102, provides in part:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country more than one year prior to the date of the application for patent in the United States * * *.

It is not necessary that the prior art disclose or describe the invention in dispute identically. If the differences between the subject matter sought to be patented and the prior art are such that the subject matter would have been obvious at the time the invention was made to a person having ordinary skill in the art, the patent will be held invalid.

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. 35 U.S.C. § 103.

Both plaintiff and defendant have submitted statements setting forth their views on the issue of novelty. Plaintiff's Statement of the Novelty of the Patented Method in Suit:

The major contribution of the Mayers Method was to teach one skilled in the art that he could safely cool an assembly containing a three-component mismatched glass-to-metal seal rapidly from a high temperature to room temperature without cracking during the cooling process, and have a finished seal which is more resistant to thermal and mechanical shock than it would be if it had been cooled by the then-known conventional stress-relieving techniques such as annealing and differential cooling. This economic method is achieved because the compressive stresses due to the mismatch of the components are enhanced by the compressive stresses introduced into the glass by the rapid cooling. Mayers further contributed the method of rapidly cooling the components described in the patent in the combination of steps also described in the patent. (P-64)

Defendant's Statement of the Question Presented to the Court:

Whether, on the question of validity, the Mayer patent which claims a process for making a three component compression seal by heating the seal to a temperature at which the glass melts, and rapidly cooling the seal to induce stress in the glass, is invalid because:

(a) the materials specified in the Mayer claim were admittedly disclosed in the German patent (D-22); in the RCA process; in the Fusite process; and by stipulation known to persons skilled in the art; and

(b) the step of heating the glass to a temperature where it flows of its own weight is expressly disclosed in the German patent (D-22); practiced in the RCA and Fusite processes; and expressly disclosed in the Lorenz application (D-20b) and

(c) the step of rapidly cooling to induce stresses in a three component compression seal is expressly disclosed in the Lorenz application (D-20b), practiced in the RCA and Fusite processes, and impliedly disclosed in the German patent (D-22). (D-32)

With respect to 35 U.S.C. § 103 the Supreme Court has stated:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or

nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. Graham v. John Deere Co., 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

It remains, therefore, to consider the prior art offered by defendant in order to determine its degree of identity with the patent in issue and its effect upon the requirement of nonobviousness. 35 U.S.C. §§ 102, 103. Defendants have cited four examples of prior art in an effort to invalidate this patent. They are German Patent 734,115 (D–22); the RCA process; the Fusite process; and the Lorenz publication.

### THE GERMAN PATENT 734, 115

This patent issued on March 11, 1937 in Germany. It dates prior to the filing date of the Mayers patent. The original German is exhibit D–22; plaintiff's translation is exhibit P–28; and defendant's translation is in exhibit D–29. Both of the translations and excerpts of testimony indicate anticipation of certain aspects of the Mayers process. It appears that the German patent discloses a three component type of compression seal utilizing materials falling within the range of Mayers Claim 1. The materials described in the German patent fall within the CTE's mentioned in the Mayers patent. Plaintiff's expert, Dr. Boeke, testified on cross-examination:

Q. * * * Now I believe you testified that this German patent discloses a compression seal.

A. That is correct.

Q. And I believe you testified that it discloses a compression seal of the three component type.

A. That is correct.

Q. And that the materials disclosed in this patent fall within the range of the Mayer's Claim 1.

A. That is correct.

Q. And when I say 'fall within the range of Mayer's Claim 1' I am referring to coefficients of expansion.

A. That is correct.

\* \* \* \* \* \*

A. The materials in the German patent fall within the CTE's mentioned in the first part of the Mayers patent, yes. (See also D–22; D–29; P–28)

Accordingly, plaintiff's claims with respect to the compressive stresses caused by mismatching of CTE's are anticipated by this patent and are not novel.

Plaintiff has tried to distinguish this patent from Mayers by referring to the suggested limitation upon maximum temperature in the German patent. The German patent instructs the reader to heat the assembly until the glass melts down and fills the space between the wire and cylindrical part. It further teaches not to take the fusing temperature too high, a satisfactory temperature being about 900 degrees centigrade. (P–28 at 5; D–29 at 6). Plaintiff stresses this as a significant difference from Mayers, which states that the glass should be heated to a temperature at which it melts and flows radially of its own weight to fill the radial space between the inner and outer metal members (P–5). It is suggested that the German temperature is lower, causing the glass to be mushy like snow, rather than a liquid as in Mayers process. The alleged significance of this difference is that molten glass can accommodate more stress in cooling. This possible distinction between maximum temperatures does not appear to distinguish these patents meaningfully. As indicated before, the crucial temperature range for setting up stress within the glass is in the annealing range. The cooling above and below the range is not the primary consideration. It was admitted by Jan Boeke, plaintiff's expert, that the desig-

nation of 900 degrees centigrade as a preferable upper limit was of no consequence; it was a matter of economics to avoid wasted heat.

THE COURT: May I interrupt you a minute, Doctor. Is it my understanding that when you were reciting prior art that you said the practice was to keep the temperature in the approximate range of 900 degrees Fahrenheit.

THE WITNESS: In one particular patent we have been discussing, the so-called German patent, there has been set the preferable limit of 900 degrees Centigrade, which is around 1640 degrees Fahrenheit, as a preferable limit of operation.

THE COURT: I think you also mentioned that as far as the Mayers patent was concerned, heat was of no consequence.

THE WITNESS: That was of no consequence. It was just a particular method.

THE COURT: The importance of heat was only to get it to a point where the glass would flow.

THE WITNESS: Correct, and it is a matter of economics, you don't want to waste heat. You still do not go higher than is necessary.

The distinction suggested between "flows of its own weight" in Mayers patent and "melts down and fills the space" in the German patent is not a convincing one. In any event, the glass is strain free above the annealing range and no annealing range indicated by the exhibits in this case reaches upwards to 900 degrees centigrade. The attempt to distinguish the Mayers and German patent based upon an upper temperature limit is not convincing.

The inquiry regarding the German patent must now focus upon the creation of tensile stresses within the glass member by the Mayers patent. These stresses are established by *rapidly cooling* the glass through the annealing range without annealing. The German patent does not specifically describe the method of cooling, but rather leaves the

technique to the skilled person. It thus appears that the anticipation of Mayers process by the German patent depends upon whether the method of cooling implied by the German patent is similar to or the same as the important process of rapid cooling without annealing essential to the success of the Mayers process. It seems that the specificity required for an anticipation under 35 U.S.C. § 102 of the rapid cooling step is not satisfied by this foreign patent.

"A foreign patent is to be measured as anticipatory, not by what might have been made out of it, but by what is clearly and definitely expressed in it. An American patent is not anticipated by a prior foreign patent, unless the latter exhibits the invention in such full, clear, and exact terms as to enable any person skilled in the art to practice it without the necessity of making experiments." Borg-Warner Corp. v. Mall Tool Company, 220 F.2d 803, 805 (7th Cir. 1955). See also Montmarquet v. Johnson & Johnson, 82 F.Supp. 469, 475–476 (D.C.N.J.1949), aff'd 179 F.2d 240 (3rd Cir. 1950); cert. den. 339 U.S. 979, 70 S.Ct. 1025, 94 L.Ed. 1384 (1950).

The argument that the German patent implies rapid cooling does not satisfy the requirements of anticipation under 35 U.S.C. § 102 and therefore this patent does not anticipate Mayers *rapid cooling*. This conclusion is especially true because the prior art patent involved is a foreign patent. The result reached under section 102 does not necessarily mean that the validity of the Mayers patent is unaffected by the German patent. The effect of 35 U.S.C. § 103 (Conditions of patentability; nonobvious subject matter) must be considered.

■ In considering the issue of obviousness or nonobviousness the Court should focus upon the rapid cooling process in the following respects: (1) The scope and content of the prior art; (2) The differences between the prior art and the claims at issue; (3) The level of skill in the pertinent art. If these factors are not conclusive, secondary con-

siderations such as commercial success, long felt but unsolved needs failure of others, etc., can be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. Graham v. John Deere Co., 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

The concept of rapidly cooling glass without annealing is not new. A rapid cooling of glass, called tempering, has been known and used for centuries. Rapid cooling per se, therefore, is not invention and would be obvious to a person skilled in the art. The issue here is: Would rapid cooling without annealing applied to other than flat glass be obvious to one skilled in the art. The glass in these seals is not flat glass. The evidence seems to support the conclusion that one skilled in the field would seek to avoid, in a glass-to-metal seal, tensile stresses produced by rapid cooling because of the belief that they were undesirable and likely to rupture the glass. A statement of the Supreme Court in United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966) discusses an issue similar to that raised in the present case:

> These long-accepted factors, when taken together, would, we believe, deter any investigation into such a combination as is used by Adams. This is not to say that one who merely finds new uses for old inventions by shutting his eyes to their prior disadvantages thereby discovers a patentable innovation. We do say, however, that known disadvantages in old devices which would naturally discourage the search for new inventions may be taken into account in determining obviousness. *Id.* at 52, 86 S.Ct. at 714.

It appears that the long accepted belief that annealing was necessary would deter one skilled in the art from rapidly cooling a three component glass-to-metal seal. The inclusion of the German patent in the prior art does not add information that would change the above conclusion. Accordingly, the German patent by itself does not make the May-

ers rapid cooling process obvious to a person having ordinary skill in the art. This does not mean that the other offers of prior art, considered alone or in combinations with the German patent, cannot serve to invalidate the Mayers patent. These offers of prior art will now be considered.

## THE FUSITE PROCESS

Andrew Wyzanbeek, vice-president in charge of engineering, research and marketing for the Fusite Corporation testified for defendants concerning an alleged prior use. He stated that the Fusite process was practiced many years before the filing date of the Mayers patent and is still in commercial use today. He described the process as the making of a three component glass-to-metal seal.

A. The three components were assembled into jigs, which were placed on trays. And these assemblies were placed on the conveyor belt of a gas-fired conveyor belt furnace.

\* \* \* \* \* \*

A. Yes. We normally ran this furnace at approximately 1650 degrees Fahrenheit.

\* \* \* \* \* \*

A. I know that when this glass was subjected to this temperature the glass flowed from the bead shape in which it was originally placed and flowed to form the geometry of the end product.

\* \* \* \* \* \*

Q. Do you know how long it took for the assemblies to cool from the exiting temperature to a touchable temperature?

A. This was a little over five minutes.

Q. Did Fusite anneal the glass in the seals which were made by this process?

A. No.

\* \* \* \* \* \*

A. The process was in use when I started in 1946 and was continuously used until 1951.

\* \* \* \* \* \*

A. That specific process is in use in a slightly different furnace in our plant in Holland, in Japan and in Puerto Rico.

\* \* \* \* \* \*

A. Up until 1951 we calculated between two and three million of these specific seals were sold.

This testimony describes a process very similar to that described by the Mayers patent. The important aspect of the testimony indicates that the Fusite process cooled the seal to a touchable temperature in a little over five minutes *without annealing*. This appears to anticipate the important rapid cooling without annealing aspect of Mayers process. Plaintiff has attempted to distinguish the Fusite process by focusing upon the fact that Fusite used frit rather than glass in its seal and that frit has varying CTE's. This difference apparently would affect the type of compression seal produced because the differences in CTE's between the glass and metal parts is what causes the "compression" in the three component compression seal. Frit appears to be molten glass which is poured into water, causing the glass to assume a friable and porous structure. It does appear that the CTE's of frit could vary from batch to batch. Plaintiff also suggests that Fusite relied on a chemical bond and that this seal was a matched seal rather than a mismatched compression seal. An attempt is also made to distinguish the processes by stressing the lower maximum temperature of Fusite and by suggesting that Fusite differentially cools rather than uniformly cools. These objections, however, all relate to the compression stress aspect of the seal. It has been established previously that mismatched compression seals were made prior to the Mayers patent. The German patent previously discussed such a mismatched compression seal. The important point is the rapid cooling without annealing and Fusite, according to the testimony, did not anneal their seals. Subject to the law applicable to prior uses, it appears that Fusite anticipated Mayers rapid cooling without annealing. The legal requirements will now be discussed.

■ This asserted public use rests almost solely upon the oral testimony of Wyzanbeek. The defense of prior use is one where an alleged infringer has the burden of persuasion. This burden is a heavy one and must be so strong as to remove all reasonable doubt. Every reasonable doubt should be resolved against the one who raises this defense. Jones Knitting Corp. v. Morgan, 361 F.2d 451, 455 (3rd Cir. 1966). The prior use must be publicly known before it can anticipate a patent. Several exhibits showing the seals made by Fusite have been marked in evidence (D–5F; D–5D; D–5N; D–5L; D–5M; D–5EE; D–5AA), but they do not show the method of cooling used prior to 1951. The process of not annealing was revealed by Wyzanbeek in oral testimony. The witness admitted that there was no operating manual with respect to the Fusite pre-1950 seal and that he was relying upon memory:

Q. Mr. Wyzanbeek, do you recall our asking you to produce the operating manual with respect to the compression seal which you testified Fusite made before 1950, and your stating that there wasn't one, that you were relying completely on your memory for all these things?

A. Yes.

\* \* \* \* \* \*

Q. May we agree that you have found no document showing Fusite's process for making the seals prior to 1950?

A. Yes.

The fact that Fusite seals were sold to the public in substantial numbers is revealed in the oral testimony and corroborated to some extent by the exhibits, especially the pre-1950 catalogue (D–5L). The oral testimony indicating that Fusite rapidly cooled without annealing is not corroborated by the exhibits or otherwise. Under the strict evidentiary rules covering prior uses, there is a

reasonable doubt concerning the rapid cooling process used by Fusite. Accordingly, the proof of the Fusite process is not sufficient to anticipate the Mayers rapid cooling procedure. See Jones Knitting Corp. v. Morgan, 361 F.2d 451, 455–456 (3rd Cir. 1966).

## THE RCA PROCESS

John L. Gallup was called by the defense to explain the RCA process. He worked for RCA from 1932 to 1966 and was responsible for technical supervision of all glass-to-metal seal processes throughout the plants of the tube division. He made measurements regarding this process many years prior to this lawsuit. There was no attempt, according to his testimony, to anneal the glass in the RCA process and the seals were strained. His testimony indicated that the CTE's of the materials used by RCA were within the limits specified in the Mayers patent and that these materials were used by RCA prior to 1951. The process was described by the witness:

A. The parts are loaded into the stainless steel jigs or molds in the first four positions on the stem machine. The parts, as used, consist of a small steel ring. * * *

*     *     *     *     *     *

The parts consist of three types of materials. These are the Dumet leads. They are loaded inside the glass cylinder, which is a straight glass cylinder, perhaps three-quarters of an inch high. The exhaust tube is loaded in the top part of the jig, or mold, which is not shown in this first drawing (D–2A). Here is the top part of the jig, after the pressing has occurred. And this is the exhaust tube, which is joined to the glass.

*     *     *     *     *     *

A. The first four positions on the stem machine are taken up by loading these different parts. The girl puts the exhaust tube in the upper mold, or jig, and the glass on the lower mold. It moves on, and an automatic loader drops the leads down through the holes in the upper mold. And they enter the holes in the lower mold. And they are inside the glass cylinder. Then we move into the fires. The first fire is at position 10.

Q. When you say "position 10", Mr. Gallup, are you referring to a position corresponding to position 10 in the Monack patent? (P–54)

A. Yes, I am.

The first fires are rather gentle. The glass, of course—the molds are warm, since this is a continuous operation. And the glass cylinder has been getting heat from the bottom mold and from the top mold.

Then finally in position 10 the first relatively soft fires play on the outside of the glass cylinder as the machine rotates and warm it up. And they continue to warm it up in position 11 and 12.

Finally, in position 13 the fires are made very hot and very sharp. And the temperature is *1100 degrees Centigrade or, I believe, 2012 degrees Fahrenheit.* This is for the purpose of tacking the glass to the lead wires at the center. And we want to tack it to the lead wires because as we continue to heat the glass *it is going to melt and flow radially inwards,* under its own force, and it is going to pull up from the mold surface and down from the top to form a doughnut of molten glass and closing the lead wires.

*     *     *     *     *     *

A. * * * This doughnut is formed— the glass has melted and flowed by position 16 enough to have formed this doughnut in the shape and orientation shown in position 3. (D–2A)

*     *     *     *     *     *

A. Now we then move on to positions 16, 17 and 18. In position 18 the metal outer ring, the outer member of the seal, is moved up into the flames and the glass and the outer metal member are heated and also the exhaust tube is lowered slowly by a cam mechanism.

*     *     *     *     *     *

THE WITNESS.: A flame which I didn't draw here is impinging, coming up at an angle, and impinging on the bottom. The stem [seal] is made upside down, and so it is really impinging on the end of the exhaust tube. This is in position 18. Now we then have heated the metal ring, the outer metal member, the glass tube and the exhaust tube simultaneously.

\* \* \* \* \* \*

A. \* \* \* Then as the machine indexes between position 18 and position 19 \* \* \* the glass is pressed. The upper jig comes down and squeezes the molten glass against the rim and also a pin, not shown in the drawing, comes up from the bottom mold to hold open the upper exhaust tube, and the upper exhaust tube is pressed. Now the temperature in the curve represents the cooling of the glass by the relatively cool mold as it is pressed. Then it goes into position 19 and it now has this form. It is a form stem, complete in appearance as this stem is, but it gets another heating, and this is not shown on this chart, and in this other heating the flames impinge at an angle so that they hit both the glass and the outer metal member as they come in and the flame splits. Part of it goes down and part goes this way.

\* \* \* \* \* \*

A. \* \* \* in the second press position the temperature on the combined unit reaches 1020 degrees Centigrade. \* \* \*

\* \* \* \* \* \*

A. And at this point you are reheating the seal which has its final shape and form in order to dissolve enough of the oxide that has been formed during the previous heating of the cold rolled steel rim, so that there will not be a porous layer of oxide remaining between the glass and the metal at that point, $Fe_3O_4$, which is black oxide that is formed is quite porous if it has any appreciable thickness.

\* \* \* \* \* \*

Q. Two or three quick questions in regard to that process, Mr. Gallup. When you mentioned that the temperature of the glass was brought to the working point, how do you characterize the working point in terms of flow?

A. It is the point at which the glass will flow readily of its own weight without any added outside source.

Q. Why did RCA apply this press to the glass?

A. Because the glass still has sufficient viscosity so that in the short time available, the six second time available in the press position, there is not time for the glass to flow the whole distance that would be required to make firm contact with the outer metal member. .

\* \* \* \* \* \*

Q. What is the rate of cooling produced by the cooling blast of the air at station 5 in Exhibit B–2A [D–2A]?

A. It drops the temperature from about 1020 in position 19.

\* \* \* \* \* \*

A. 1020 degrees Centigrade to a value of 475 for the metal and 550 for the glass.

Q. Is it shown in your chart, D–14?

A. Yes. It shows here at position 20 that the metal, because of the air blast and because the metal is on the outside and the air blast is hitting the metal, the metal has cooled below the temperature of the glass at the same point, so at position 21 we apply edge fires to reheat the metal and to bring it back to the glass temperature *so we can avoid the differential cooling which, of course, would give us a lower compression* than we want. We want the maximum compression we can get, so we reheat the cooled metal in position, but not the glass.

\* \* \* \* \* \*

Q. Where is the annealing range in that chart, D–14?

A. The annealing range is the yellow portion there between 815 Fahrenheit and the strain of 743 degrees Fahrenheit.

* * * * * *

Q. What purpose is served by avoiding differential cooling?

A. This gives us a higher compressional strain in the stem [seal] than we would get if we tried to use differential cooling.

* * * * * *

Q. Where is the stem [seal] discharged?

A. At position 24, right at the top of the annealing range here, just as we have got it into the annealing range we discharge it.

* * * * * *

A. When it is discharged it goes into the rotating basket, a rotating asbestos-lined basket to finish its cooling, and it goes through the annealing range in about one index position and *goes through the annealing range in about six seconds*, and the next temperature that we took was at the 30-second position after it had been in the basket 30 seconds, and at that point it was down to 600 degrees Fahrenheit, which is some 143 degrees below the bottom of the annealing range, and from there on no strain can be introduced or removed from the glass.

* * * * * *

Q. In the RCA process, is there an annealing step?

A. *No, there is no annealing step.* (Emphasis supplied.)

Accepting this testimony, the following conclusions can be drawn: (1) The RCA process produces a stressed compression seal and is intended to produce such a seal; (2) It produces a three component seal with a similar CTE differential as in the Mayers seal, except that there is a separate exhaust tube which is fused to the glass member; (3) The assembly is rapidly cooled and not annealed; (4) The separate heating of the metal is designed to avoid differential cooling and thus achieve uniform cooling for maximum compressive stress.

Additional testimony indicated that RCA still uses this same process and has made substantial numbers of these seals. The process does seem to duplicate the process of the Mayers patent.

Plaintiff has presented many arguments in an attempt to establish that the RCA process is not the same as the Mayers process. It is suggested, for example, that RCA does not rapidly cool; that RCA differentially cools to avoid strain rather than uniformly cools; that RCA does not heat to Mayers' high heat; that the RCA seals are subject to spontaneous rupture; that the temperature measurements shown on chart D–14 were inaccurate; and that the two patents upon which the RCA process is based reveal a process seeking to relieve strain by annealing. The last argument seems to have the most substance and will be considered first. A review of the testimony concerning this process reveals that the seal goes through the annealing range in six seconds and that there was no annealing step. This conclusion is supported by the testimony of John Gallup and the temperature profile, Chart D–14, which was asserted to represent the RCA process. It was also established, however, that the RCA process is described in Miller and Spooner Patent 2,334,020 and Monack Patent 2,345,278 and that the apparent teaching of these patents was to produce a seal with reduced strain with annealing rather than a stressed seal. Gallup met this argument by testifying that the statements in these patents concerning annealing and relieving strain were contrary to the facts and that the resulting seals were actually highly strained. He further stated that the steps in the process were the same as in Monack, but the reasons given for the steps were different. It appears from the evidence that the RCA process is based upon the Monack and Miller-Spooner patents, but that those patents suggest relieving strain with annealing while the evidence describing the RCA process establishes a rapidly cooled stressed seal that is not annealed. The evidence creates an inconsistency. The RCA process has been submitted as a prior use, not as prior patents; namely,

Miller-Spooner and Monack, but these patents are the basis of the process and the conflicting evidence brings into focus the issue of the sufficiency of proof of prior use. The temperature profile chart of the RCA process (D–14) was made in 1967. There was no profile submitted that was made prior to 1950. Mr. Gallup testified that the 1967 profile represented the Monack procedure and RCA process prior to 1950. While the Gallup testimony, experience, qualifications, and asserted personal knowledge were convincing, the burden of proof essential to establish the prior use is great. The burden of proving a prior use must be clear, satisfactory, and beyond a reasonable doubt. Jones Knitting Corp. v. Morgan, 361 F.2d 451, 456 (3rd Cir. 1966). There is no tangible corroborating evidence that establishes the fact that RCA was using the process reflected in the D–14 profile prior to 1950. The testimony of Mr. Gallup was convincing but the inconsistencies brought out by the defense involving the Miller-Spooner and Monack patents raise a substantial question of whether the pre-1950 process is the same process described by the witness and revealed in the temperature profile. Mr. Gallup, it should be noted, admitted that Monack and Miller-Spooner were the basis of the RCA process. Accordingly, the proofs offered to establish the RCA prior use fail to meet the strict standards required by the law. Accepting this result, it is unnecessary to consider defendant's other arguments set forth in an attempt to distinguish the RCA and Mayers processes.

## LORENZ PATENT APPLICATION

This is a German patent application dated November 3, 1941. It is presented as an invention described in a printed publication in this or a foreign country.

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or *described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent,* or

(b) the invention was patented or *described in a printed publication in this or a foreign country* or in public use or on sale in this country *more than one year prior to the date of the application for patent in the United States * * *.* 35 U.S.C. § 102.

The first Mayers patent application was filed on March 17, 1951; the process was "invented" in early 1950. The initial issue raised by the Lorenz application is the status of the application as a printed publication under the statute. It was filed in the German patent office on November 3, 1941 and its availability for public inspection appeared in a German document entitled "Patentblat" on July 30, 1942 (D–20b(1)). The application was microfilmed by the U. S. Office of Military Government for Germany and identified by reel Number 831, Class 32b, on page 13 in Fiat Technical Bulletin T–50, dated May 29, 1947 (D–20B–4). The microfilm was accessible in the Library of Congress in Washington, D. C. on reel No. 831, identified by frames 8374, 8375, 8376, 8377 and available to the general public June 4, 1948. A document entitled "Bibliography of Scientific and Industrial Reports," Vol. 9, No. 10, dated June 4, 1948 which was received in the Library of Congress on June 21, 1948 lists the Lorenz microfilm under the heading "Patents" and subheading "Minerals and Mineral Products" on pages 906–911. The title of the Lorenz Application is on page 907, No. 8374, 8377: *"Vacuum fusions of metal and glass, not affected by temperature,* German patent application L99347 VI32b, dated November 3, 1941. In German." (D–20B–3). A printed abstract of the Lorenz application was also lodged in the British Patent Office and available to the public on November 1, 1948 (D–20B–5) and the bibliography indexing the microfilm was also available in a library in Stockholm, Sweden (D–20B–7).

■ A patent application, foreign or domestic, that is merely open for inspection in a patent office (and not ultimately resulting in a patent) should not be regarded as a printed publication under the statute. Ex parte Haller, 103 U.S. P.Q. 332 (Pat.Off.Bd. of App. 1953); Celanese Corporation of America v. Ribbon Narrow Fabrics Co., Inc., 117 F.2d 481 (2nd Cir. 1941). See White Cap Co. v. Owens-Illinois Glass Co., 203 F.2d 694, 696 (6th Cir. 1953); Package Devices, Inc. v. Sun Ray Drug Co., 301 F.Supp. 768, 779 (E.D.Pa.1969). Cf. Ellis-Foster Co. v. Reichhold Chemicals, 198 F.2d 42 (3rd Cir. 1952). A patent application, however, could be a printed publication if it was "printed" and "published" outside of patent office files in a manner complying with the statute. In Application of Tenney, 254 F.2d 619, 622, 45 CCPA 894 (1958) it was held that a German patent application reproduced on microfilm and filed in the Library of Congress could not be considered "printed" because "there is no probability, from a mere showing that a microfilm copy of a disclosure has been produced, that the disclosure has achieved wide circulation and that, therefore, the public has knowledge of it." Id. at 627. The concurring opinion in *Tenny* agreed with the result but stressed that a literal interpretation of "printed publication" should not be the only factor considered, but that availability, accessibility, and dissemination are also relevant. It should be noted that the microfilm was misclassified in *Tenny* under a misleading label. This same issue was again raised in I. C. E. Corporation v. Armco Steel Corporation, 250 F.Supp. 738 (S.D. N.Y.1966). That case also involved a German patent application reproduced upon microfilm and stored in the Library of Congress. The Court stated:

\* \* \* it is no longer reasonable to assume as the majority of the Court in *Tenny* apparently did, that the traditional methods of 'printing' are the only acceptable methods, for the purposes of Section 102. In the light of modern developments, a preferable rationale for the result in *Tenny* would have been that the microfilmed material, whether 'printed' or not, was not shown to be sufficiently accessible to the public so as to constitute a 'publication' within the meaning of the statute.

\* \* \* \* \* \*
\* \* \* the term "printed publication" \* \* \* can include a document printed, reproduced or duplicated by modern day methods, including microfilming, upon a satisfactory showing that such document has been *disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it* and recognize and comprehend therefrom the essentials of the claimed invention without the need of further research or experimentation. *Id.* at 742–743. (Emphasis supplied.)

■ The reasoning in *I. C. E. Corp.*, *supra*, appears sound. There is no persuasive testimony to establish that a person interested and ordinarily skilled in the art could locate this microfilm by the exercise of reasonable diligence or whether the filing index was erroneous or misleading. The evidence supplied by exhibits will be reviewed in an effort to decide this question. The Library of Congress certified that the microfilm was available to the general public as indexed by the bibliography discussed previously (D–20B–2). The Bibliography of Scientific Reports lists the microfilm under the general heading "patents". This does not appear to be misleading or a misfiling. The subheading listed is "minerals and mineral products." Such a classification might seem inappropriate and misleading as a reference to glass-to-metal seals, but a review of the other patent applications located on the same index page as the Lorenze microfilm index indicates that they all involve devices or processes involving glass or glass-metal combinations. One citation mentions annealing, and another

mentions fusion of glass and metal. It should not be concluded that all of these references were misfiled. It appears that it was proper to file this application under the above mentioned subheading and that this was neither a misfiling nor misleading. The final title of the microfilm was "vacuum fusions of metal and glass, not affected by temperature" (D–20B–3). The basic field of art involved in this case concerns the fusing of glass and metal through a controlled heating and cooling procedure. The seals involved are used to insure vacuum tight electrical products. It is concluded that this microfilm, as indexed, was available to persons interested and could be located by persons ordinarily skilled in the subject matter with the exercise of reasonable diligence. Accordingly, the microfilm is a printed publication under the statute.

■ The law of anticipation is the same for both printed publications and prior patents. Baldwin-Lima-Hamilton Corp. v. Tatnall Meas. Sys. Co., 169 F. Supp. 1, 12 (E.D.Pa.1958); aff'd 268 F.2d 395 (3rd Cir. 1959); cert. den., 361 U.S. 894, 80 S.Ct. 198, 4 L.Ed.2d 151 (1959). The test to be utilized in determining whether a publication may be applied to defeat a patent, is that the prior publication must exhibit a substantial representation of the invention in such full, clear, and exact terms that one skilled in the art may make, construct and practice the invention without having to depend on either the patent or on his own inventive skills. Cummins Engine Co. v. General Motors Corp., 299 F. Supp. 59, 91 (D.C.Md.1969). See also Skelly Oil Co. v. Universal Oil Products Co., 31 F.2d 427, 431 (3rd Cir. 1929). It does not appear that the Lorenz application, considered alone, anticipates the patent in suit.

The first claim of the Lorenz application states:

1. Method of producing gas-tight metal-to-glass seals which are insensitive to temperature and in which compressive stresses are produced in the glass, characterized by the fact that the metal surrounds the glass and the mass of glass is rapidly cooled, immediately after completion of the melting process, by additional coolants from a temperature which lies above the transformation point. (D–22b; D–29).

There are no diagrams to aid the reader; there is no discussion of the specific materials to be used; there is no indication of the exact nature of the seals; and there is no explanation of the importance of the selection of CTE's in order to obtain the desired compressive stresses. The application, however, does clearly indicate that a rapid cooling procedure should be used in making these seals. Plaintiff's witness, Guy E. Rindone, a professor of ceramic science at Pennsylvania State University, testified on the Lorenz application. His testimony pointed out the deficiencies in that application as an anticipation of the Mayers patent. His testimony was convincing in so far as it supports the conclusion that Lorenz by itself, does not constitute an anticipation of the Mayers patent. Accordingly, the Lorenz application does not negative the novelty of the patent in suit.

## THE COMBINATION OF GERMAN PATENT 735,115 AND THE LORENZ APPLICATION

■ The issue as it now appears is whether a combination of the German patent 735,115 and the Lorenz application will invalidate the Mayers patent. No single prior art reference asserted by defendant and admissible has negatived the novelty of this patent under 35 U.S.C. § 102. References, however, may be combined for the purpose of showing that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art. 35 U.S.C. § 103; Deller's Walker on Patents, 2d Ed., Sec. 72, p. 334–37. It is not necessary to the invalidity of a patent that a complete anticipation be disclosed in a single prior patent. The same is true where a prior

publication is relied upon. Engelhard Industries, Inc. v. Sel Rex Corp., 253 F. Supp. 832, 837–838 (D.C.N.J.1966); supplemented 255 F.Supp. 620 (D.C.N.J. 1966); aff'd 384 F.2d 877 (3rd Cir. 1967). See Baldwin-Lima-Hamilton Corp. v. Tatnall Meas. Sys., 169 F.Supp. 1, 12 (E.D.Pa.1958); aff'd 268 F.2d 395 (3rd Cir. 1969); cert. den., 361 U.S. 894, 80 S.Ct. 198, 4 L.Ed.2d 151 (1959). The effects of a combination of these two references on the obviousness or lack of "invention" of the Mayers process must be considered.

▇ German patent 734,115, as discussed previously, discloses a three component type of compression seal utilizing materials falling within the CTE range of Mayers Claim 1. The creation of a compression seal through the use of mismatched CTE's was known in the prior art. The German patent does not disclose a cooling rate. The Lorenz application involves a gas tight metal-to-glass compression seal. The exact nature of the seals is not disclosed and the selection of proper CTE's is not discussed. The application does indicate that a *rapid cooling* procedure should be used in making these seals. The concept of rapid cooling a glass-to-metal seal, therefore, was known in the prior art. In summary, the prior art reveals knowledge of three component glass-to-metal compression seals with the same CTE's as Mayers process in one reference and rapid cooling of gas tight metal-to-glass compressive seals in a separate reference. The prior art reveals all of the important elements of Mayers process. The fact that the elements of the process were known in separate references of prior art does not necessarily make the process unpatentable. If the combination of these elements into one process would *not have been obvious* to a person having ordinary skill in the art, the faculty of invention could have been exercised in combining them and the patent would be valid. Application of Carter, 212 F.2d 189, 192, 41 CCPA 851 (1954). See Great A & P Tea Co. v. Supermarket Equipment Corp., 340 U.S.

147, 150–153, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Tele-Sonic Packaging Corp. v. Errich International Corp., 173 F.Supp. 335, 342 (S.D.N.Y.1959). If, on the other hand, the combination was obvious, the patent would be invalid. This question will now be considered.

Defendant's witness, John Gallup, a well qualified expert in the field of glass technology, testified concerning the combination of the teachings of Lorenz and German patent 734,115:

Q. Mr. Gallup, is there any reason why you, as a person skilled in the art, would not combine the teachings of Lorenze and the Bergkamph patents? [Reference is to German patent 734,115 inventor Erich Schwartz, Doctor of Technology of *Bergkamph* in Berlin-Siemensstadt] (D–22; D–29; P–28).

A. No, if I had both of them in front of me—since they both produce compressive stresses and specify the method of doing it, I would combine them in order to get the advantages of both patents.

Q. And if you combined the teachings of Lorenz with the teachings of Bergkamph, how would you cool the seal disclosed in the Bergkamph patent?

A. You would cool it rapidly, to induce stress.

The German patent clearly involves a compression type glass-metal seal and, similarly, the Lorenz application discusses the production of compressive stresses by the metal surrounding the glass. The application also suggests that compressive stresses are produced in order to avoid the disadvantages of tensile stresses that may cause cracking.

In order to avoid such tensile stresses and the resultant cracking of such glass-to-metal seals, compressive stresses are produced in the glass. It is known that these compressive stresses may be produced by, for instance, shrinking a metal ring onto the glass. By the production of such compressive stresses, the sensitivity of the

seal to unilateral temperature stress is reduced. The compressive strength of glass is substantially higher than its tensile strength. Accordingly, as a result of the production of compressive stresses in the glass, no damage to the seal occurs. (D–20B).

This reasoning appears similar to the explanation of how the Mayers process produces a strong seal with the interaction of compressive stresses, caused by mismatched CTE's, with tensile stresses, caused by rapid cooling, within the glass member. The evidence appears to support the conclusion that the combination of the three component mismatched CTE elements of the German patent with the rapid cooling procedure of the Lorenz application would have been obvious to a person having ordinary skill in the art. Both references deal with glass-to-metal seals; both refer to achieving compression; the Lorenz application discusses tensile stresses and how compressive stress can avoid the dangers caused by such tensile stress; and one skilled in the art would realize that rapid cooling, advocated by Lorenz, creates tensile stresses. The two references viewed together would seem to suggest a combination of the German compression elements with the Lorenz rapid cooling process to produce a glass-to-metal seal. Accepting this reasoning, the Mayers patent would be invalid under 35 U.S.C. § 103.

■■■■ There is a presumption of validity that attaches to a patent approved by the Patent Office. The burden of establishing invalidity rests upon a party asserting it. 35 U.S.C. § 282. This presumption, however, is weakened where the Patent Office has not considered important portions of the prior art. Dole Refrigerating Co. v. Americo Contact Plate Freezers, Inc., 265 F.2d 627 (3rd Cir. 1959); Scripto Inc. v. Ferber Corp., 267 F.2d 308 (3rd Cir. 1959) cert. den. 361 U.S. 864, 80 S.Ct. 122, 4 L.Ed. 2d 104 (1959). Even in a situation where the Patent Office Board of Appeals, in a contested proceeding, has considered a matter to be patentable, the courts do not abdicate the normal judicial function and must see that the patent monopoly is enjoyed only pursuant to a correct standard of invention properly applied. Alco Kar Kurb, Inc. v. Ager, 286 F.2d 931 (3rd Cir. 1961). There is no indication that the Patent Office considered the German patent or the Lorenze Application in this case. (D–26). They could not, therefore, have considered a possible combination of these examples of prior art. The presumption of validity has been overcome.

## INDEFINITENESS OF CLAIMS

■■■■ Defendant asserts that the patent is invalid for indefiniteness. If the Court rules that the patent is invalid because of obviousness, the issue of indefiniteness is moot. The question will be considered, however, in the alternative. 35 U.S.C. § 112 provides:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention. * * *

■■■■ This statute requires a balancing of two interests. On the one hand those skilled in the art must be able to understand and apply the teachings of the invention and enterprise and experimentation must not be discouraged by the creation of an area of uncertainty as to the scope of the invention. On the other hand, protection is not accorded to only those patents which were capable of precise definition; the patent statute contemplates granting protection to valid inventions.

" * * * patentable inventions cannot always be described in terms of exact measurements, symbols and formulae, and the applicant necessarily must use the meager tools provided by language, tools which admittedly lack exactitude and precision. If the claims, read in the light of the specifications, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more." Jones Knitting Corp. v. Morgan, 361 F.2d 451, 454 (3rd Cir. 1966).

The patent does not specify the temperature degree to which the glass must be heated nor does it define the time limit or define the term rapid cooling directly. One skilled in the art, however, could ascertain the appropriate temperature and cooling time from a reading of these terms in context. The temperature is ascertainable by reference to the criteria "at which the glass melts and flows radially of its own weight" This definition, in fact, is preferable to a specific temperature because different glasses might be used and different flow points might apply. One skilled in the art could easily ascertain the melting and flow points of a particular glass. Rapid cooling "to avoid annealing and set up stress" is another criteria that can be determined from the well known physical characteristics of the particular material used, and is preferable to a particular time period or temperature that would not apply to every material. A person skilled in the art could apply these criteria in the patent with accuracy depending upon the particular materials that he would use. The record supports the conclusion that the patent complies with 35 U.S.C. § 112.

Plaintiff previously filed suit in the United States District Court in Massachusetts against Electronic Products, Inc. The decision by that court upheld the validity of the patent and found that the defendant had infringed the patent. Philips Electronic and Pharmaceutical Industries Corp. v. Electronic Products,

Inc., 256 F.Supp. 705 (D.C.Mass.1966). Certain of the testimony introduced in that case was filed by stipulation as part of the record here. The defendants here were not parties to that action and the decision does not discuss all of the prior art presented in this case. While the decision of another district court involving the same patent should be considered carefully, it is not binding as *res judicata* on judgment or judgment by estoppel where different parties are involved. Edward Valves, Inc. v. Cameron Iron Works, Inc., 286 F.2d 933 (5th Cir. 1961), cert. den. 368 U.S. 833, 82 S.Ct. 55, 7 L.Ed.2d 34 (1961); Sutherland Paper Co. v. Grant Paper Box Co., 183 F.2d 926, 936 (3rd Cir. 1950), cert. den. 340 U.S. 906, 71 S.Ct. 281, 95 L.Ed. 655 (1950); Standard Brands, Inc. v. National Grain Yeast Corp., 101 F.2d 814, 816 (3rd Cir. 1939).

The patent is not valid and judgment on validity should be entered in favor of the defendant and against plaintiff without costs.

An appropriate order for entry of judgment will be submitted.

### INFRINGEMENT

Since the Court finds that the patent is invalid, there is no question of infringement. The procedure of alternatively deciding the infringement issue, however, would avoid the unnecessary delay caused by a remand in the event that a decision invalidating the patent was overruled by an appellate court. See Frank W. Egan & Co. v. Modern Plastic Machinery Corp., 387 F.2d 319, 320 (3rd Cir. 1967), cert. den. 391 U.S. 966, 88 S. Ct. 2036, 20 L.Ed.2d 879 (1968).

An infringement is the unauthorized making or using or selling of the patented invention. What is infringed are the claims of the patent which measure the invention and define precisely what the invention is, and the limits beyond which one cannot pass without infringing; therefore, it is to the claims of the patent to which the Court must look to determine whether

there is an infringement. Walker on Patents, Dellers Ed., Sec. 450 at 1681. The Supreme Court in Graver Tank & Manufacturing Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950) stated:

> In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it. *Id.* at 607, 70 S.Ct. at 855.

■■ This does not mean that the literal words of a claim as applied to an accused matter is necessarily controlling. An accused may be an infringer if a device performs substantially the same function in substantially the same way to obtain the same result although not literally following the claim. Conversely, there may be no infringement if a device or process falls within the literal language but performs the same or similar function in a substantially different manner.

> But the courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. * * * Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. * * *

> The doctrine of equivalents evolved in response to this experience. * * * 'To temper unsparing logic and prevent an infringer from stealing the benefit of an invention' a patentee may invoke this doctrine to proceed against the producer of a device 'if it performs substantially the same function in substantially the same way to obtain the same result.' * * * The theory on which it is founded is that 'if two devices do the same work in substantially the same way, and accom-

plish substantially the same result, they are the same, even though they differ in name, form, or shape.' * * * The wholesome realism of this doctrine is not always applied in favor of a patentee but is sometimes used against him. Thus, where a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement. *Graver, supra* at 607–609, 70 S.Ct. at 856. See Devex Corp. v. G. M. C., 263 F.Supp. 17, 25–26 (D.C.Del.1967).

Defendants admit that they practice the following steps of the claims of the patent in suit in the manufacture of compression glass-to-metal seals:

A. Assemble in a carbon jig an outer metal member, an inner metal member and glass all having coefficients of thermal expansion mentioned in the claims of the patent in suit.

B. Heat the entire assembly to a temperature at which the glass melts and flows of its own weight to fill the radial space between the inner and outer metal members.

C. Cool the heated assembly from the aforementioned temperature to a lower temperature at a rate which sets up stresses therein and increases the compressive forces holding the glass in the outer metal member; and

D. Remove the seal from the jig without subsequently annealing it.

It can be said, therefore, that the accused matter falls within the above mentioned aspects of plaintiff's patent claim. There is no stipulation, however, regarding the rate and type of cooling. The question that must be decided is whether the defendant's process falls within the cooling process of the patent claim.

Defendant admits in the stipulation that it does not subsequently anneal and also that its cooling sets up stresses and increases compressive forces holding the

glass in the metal member. Plaintiff's claim is similar:

> *Rapidly cooling* the heated assembly from said temperature to a lower temperature which is below the annealing temperature of the glass to solidify and *avoid annealing* the glass and to set up stress therein so as to increase the compressive forces holding the glass in the outer metal member in the glass. \* \* \*

The difference between the stipulation and claim appears to be the rapid cooling by plaintiff without annealing during the process in the jig. Defendant admits it does not anneal after removal from the jig which is similar to plaintiff's claim. The issue is whether defendant rapidly cools its seal without annealing. Several temperature profile charts have been admitted into evidence, P–16, P–39, P–47. A comparison of these charts appears to show that the temperature drop of the seal as it passes through the annealing range is rapid. The time elapsed through the annealing range is similar in each of the charts. The time spent in the annealing range appears to be less than one minute in each case. Dr. Boeke, plaintiff's witness, testified that the charts were based upon the technical information compiled by Mr. Hellegers, a disinterested expert. It appears that these charts fairly represent the temperature changes of the seals of the parties involved in this case. Defendant's witness, Dr. Gallup, testified that P–39, The T & E profile, and P–47, the Glasseal profile, appear to show rapid cooling as described by Mayers.

Dr. Rindone, plaintiff's witness, also testified that the T & E chart showed rapid cooling and that the Glasseal chart showed a similar process. He indicated that both were practically identical to the Mayers process. Alexander Anderson, vice-president of Glasseal, stated that his firm rapidly cooled their seals. Dr. Boeke expressed the opinion that defendant practices the patented invention. A comparison of these three exhibits, P–16, P–39 and P–47, in addition to the testimony, supports the conclusion that de-

fendant rapidly cools its seals without annealing. The identity between the patent claims and defendant's process consists of the following elements: (1) both assemble in a jig an outer metal member, an inner metal member, and glass having similar CTE differences; (2) both heat the entire assembly to a temperature at which the glass melts and flows of its own weight to fill the radial space between the inner and outer metal members; (3) both, accepting the conclusion outlined above, rapidly cool without annealing to set up stresses and increase the compressive forces holding the glass in the outer metal member; (4) both remove the seal from the jig without subsequently annealing the seal. Defendant's process seems to fall clearly within all of the claims of the plaintiff's patent and practices every essential of the patented method. If plaintiff's patent were valid, defendant's process would appear to infringe that patent. Plax Corp. v. Precision Extruders, Inc., 239 F.2d 792, 795 (3rd Cir. 1957); Darsyn Laboratories v. Lenox Laboratories, 120 F. Supp. 42, 50–51 (D.C.N.J.1954); aff'd 217 F.2d 648 (3rd Cir. 1954), cert. den. 349 U.S. 921, 75 S.Ct. 661, 99 L.Ed. 1253 (1955).

Defendant, however, attempts to distinguish their process by contending that they differentially cool and therefore do not infringe the patent. It may be that this argument could be classified as an attempt to establish that while the process may fall within the literal language of plaintiff's claims and while it performs a similar function and creates a similar result, it does so in a substantially different manner and, therefore, does not infringe. Alexander Anderson, vice-president and general manager of Glasseal, testified that P–47 and P–39 represented differential cooling while plaintiff uniformly cools. The attempt is thus made to distinguish plaintiff's and defendant's processes on this basis. The testimony concerning differential cooling and uniform cooling was somewhat confusing and contradictory. It appears that the Mayers process seeks

to achieve as uniform a cooling as possible in an attempt to create compression and strain. Differential cooling, in contrast, is designed to relieve stress. It appears that differential cooling is used to avoid the compression caused by mismatched CTE's. Dr. Boeke testified:

* * * And differential cooling—now to come to your question—is just such a gimmick.

What it does is this. If you know that the metal is going to put *compression* on the glass when you anneal it the slow way, as I explained to you, and you get a classical compression seal, and now you have a metal which really differs from glass, and it is heavy, and it is exerting a lot of compressive pressure, it can be just too much and shatter the glass. But if you first cooled down the metal while the *glass was still in a plastic state*, a lot of this compressive action could be vented by the glass in forming.

Now, if you cool the seal, and they go down the same, the metal only goes a little way, where it was already cooled, and sets up only a little additional stress, the glass goes a long way and shrinks a lot and in the end you end up with even no compression whatsoever.

So what you now made was by this gimmick a seal which is completely free of compressive stress, a thing that you could not even attain with classical anneal of a compression seal.

Differential cooling, therefore, avoids the compressive force created by a mismatched seal and creates a compression free seal similar to a matched seal. It appears that differential cooling to be effective requires a pre-cooling of the metal above the strain point of the glass. Dr. Boeke stated:

* * * so it is clear that when I put a ring of that metal around glass at the high temperature of the strain point where the glass is already a solid and I would cool down I would end up at room temperature with compression due to the metal shrinking around the glass, but now if in the meantime while the glass was just cooling down from its strain point I cool the metal more rapidly so it gets ahead of the glass, and particularly if I do this just above the strain point where the glass can still give a little, now I have it so that the metal goes down the smaller stretch. It was already pre-cooled * * * and if it is done right you will end up at room temperature with a completely strain-free seal, although the components are not matched.

Defendant, by stipulation, admits that it was making *compression* glass-to-metal seals. Defendant is attempting to distinguish its process from Mayers by pointing to the recoil in the temperature profile charts P–39 and P–47. This is said to represent differential cooling. The recoil in both of these charts occurs below the strain point of the glass. It seems that any differential cooling at that stage would not relieve the compression caused by the mismatched CTE's and this is the purpose of differential cooling. The stipulation and testimony indicates that defendant is producing a mismatched compression seal having the same CTE differentials as plaintiff's process recommends. The evidence does not support a distinction between these processes based upon an alleged differential cooling in defendant's process. Since defendant is making compression seals it cannot be differentially cooling these seals because such cooling would relieve the compression. Even assuming that it was differentially cooling, the point in the process where this occurs and the fact that a compression seal is produced combine to establish that such cooling is ineffective and cannot serve to distinguish plaintiff's process from the methods employed by defendant.

Accordingly, if plaintiff's patent is valid, that patent is infringed by defendant's process.